<pre>
 1                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
 2

 3
                                       )
 4   UNITED STATES OF AMERICA,          )
                                       )
 5            Plaintiff,                )
                                       )  Criminal Action
 6   v.                                 )  No. 1:20-mj-04300-DHH
                                       )
 7   DOMENIQUE DEQUON HINES,            )
                                       )
 8            Defendant.                )
                                       )
 9

10

11           BEFORE THE HONORABLE DAVID H.  HENNESSY
                 UNITED STATES MAGISTRATE JUDGE
12

13           PRELIMINARY AND DETENTION HEARING
                          Via Zoom
14

15                     January 6, 2021
                        11:06 a.m.
16

17          John J. Moakley United States Courthouse
                     One Courthouse Way
18              Boston, Massachusetts 02210

19

20

21
                     Linda Walsh, RPR, CRR
22                   Official Court Reporter
             John J. Moakley United States Courthouse
23               One Courthouse Way, Room 5205
                  Boston, Massachusetts 02210
24                  lwalshsteno@gmail.com

25
</pre>

1    APPEARANCES:

2    On Behalf of the Government:

3         UNITED STATES ATTORNEY'S OFFICE
          By: AUSA Suzanne Sullivan Jacobus
4         1 Courthouse Way, Suite 9200
          Boston, Massachusetts 02210
5         617-748-3146
          suzanne.jacobus@usdoj.gov

6

7    On Behalf of the Defendant:

8         James J. Cipoletta, Esq.
          385 Broadway, Suite 307
9         Revere, Massachusetts 02151
          781-289-7777
10        jcipoletta@comcast.net

11   ALSO PRESENT:  Jennifer Dailey, Probation

12

13

14                  Proceedings reported and produced
                     by computer-aided stenography.
15

16

17

18

19

20

21

22

23

24

25

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DEREK BACK | | | | |
| By Ms. Jacobus | 10 | | 29 | |
| By Mr. Cipoletta | | 23 | | |

E X H I B I T S

| | DESCRIPTION | RECEIVED |
|---|---|---|
| GOVERNMENT EXHIBITS | | |
| 1 | One-page criminal complaint and nine-page affidavit in support of complaint.............. | 13 |
| 2 | Illinois case criminal docket.................. | 16 |
| 3 | Illinois case Bill of Indictment.............. | 18 |

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  The U.S. District Court for the District
 3   of Massachusetts is now in session, the Honorable David
 4   Hennessy presiding.  Today is January 6th, 2021.  We're on the
 5   record in the matter of United States versus Domenique Dequon
 6   Hines, Docket 20-MJ-4300.
 7            Will counsel please identify themselves for the record
 8   as well as Probation.
 9            MS. JACOBUS:  Good morning, Your Honor.  Suzanne
10   Sullivan Jacobus on behalf of the United States.
11            THE COURT:  Good morning.
12            MR. CIPOLETTA:  Your Honor, good morning.  James
13   Cipoletta on behalf of Mr. Hines.
14            THE COURT:  Good morning.
15            U.S. PROBATION:  Good morning, Your Honor.  Jennifer
16   Dailey on behalf of U.S. Probation.
17            THE COURT:  Good morning.
18            THE CLERK:  As a reminder, persons granted remote
19   access to proceedings are reminded of the general prohibition
20   against photographing, rerecording, and rebroadcasting of court
21   proceedings.  Violations of these prohibitions may result in
22   sanctions, including removal of court-issued media credentials,
23   restricted entry to future hearings, or denial of entry to
24   further hearings and such other sanctions, including for
25   contempt of court, if deemed appropriate or necessary.
```

1          THE COURT:  Mr. Hines, can you see and hear me?

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  Okay.  This is a preliminary hearing and

4     detention hearing on your case.

5          I am in the federal courthouse in Worcester.  The

6     courthouse is open.  You're appearing by videoconference from

7     the Plymouth County Jail.  Your lawyer, the prosecutor,

8     Probation, are also, like yourself, appearing by

9     videoconference.  And I note that the clerk provided access

10    numbers to counsel for use by family members, supporters,

11    victims, and others.  We're permitting members of the public to

12    have access to this videoconference.

13         I remind everyone that no member of the public may

14    record these proceedings and that doing so may result in

15    sanctions.

16         Mr. Hines, I do want to remind you that if at any time

17    during this proceeding you want to speak to Mr. Cipoletta

18    privately, you just need to let us know, and we'll put you into

19    a breakout room with only Mr. Cipoletta so that you can confer

20    with him.

21         Ordinarily a hearing like this, where I think there

22    may be testimony, would be conducted in open court before me.

23    You would be present, your lawyer, the prosecutor.  But because

24    of the coronavirus pandemic, we're conducting proceedings such

25    as this one by videoconference.  We do so to protect the health

1    and safety of everyone, including yourself, and at the same

2    time we want to have hearings like this, which involve your

3    liberty interests, to go forward as promptly as possible.  So

4    we're giving defendants who agree to appear by video the option

5    to do so.  It's voluntary.  You don't have to agree to appear

6    by video.

7          I want to ask you a few questions to make sure that

8    you understand your right to be physically present in court and

9    that you are in fact prepared to waive that right.

10         Do you understand that you have the right to be

11   physically present in court for this hearing?

12         THE DEFENDANT:  Yes.

13         THE COURT:  And have you discussed the fact that

14   you're appearing by video with Mr. Cipoletta as your lawyer?

15         THE DEFENDANT:  Yes.

16         THE COURT:  Do you understand also that if at any time

17   during this hearing you want to speak to Mr. Cipoletta, you

18   just need to let us know, and I will arrange for you and

19   Mr. Cipoletta to speak privately?

20         THE DEFENDANT:  Yes.

21         THE COURT:  And, finally, do you understand that the

22   courthouse that I'm in is open?  And even though you and others

23   are appearing by video, this is still a public proceeding.

24         THE DEFENDANT:  Yes.

25         THE COURT:  Do you agree to waive your right to appear

1    in person and do you agree to appear instead by video?

2            THE DEFENDANT:  Yes.

3            THE COURT:  Mr. Cipoletta, any reason I should not

4    accept Mr. Hines' waiver?

5            MR. CIPOLETTA:  No, Your Honor.

6            THE COURT:  Ms. Jacobus, any objection from the

7    Government?

8            MS. JACOBUS:  No, Your Honor.

9            THE COURT:  I find that the defendant has knowingly

10   and voluntarily waived his right to appear physically at this

11   hearing.

12           I find that requiring the defendant to be present

13   would jeopardize the health and safety of those who are or

14   would be present with him during his transportation and this

15   court proceeding.

16           I find that delay would seriously jeopardize the

17   interest of justice.

18           I find the measures taken to provide public access to

19   this proceeding are reasonable under the circumstances.

20           Therefore, I accept the waiver, and we will proceed to

21   the hearing.

22           As I indicated, this is on for a preliminary hearing

23   and a detention hearing.  The Government moved for detention on

24   both grounds of dangerousness and risk of flight.

25           Since we were last together, I have received from

1    Ms. Dailey the pretrial services report.  And I note that

2    yesterday Mr. Cipoletta filed a motion on behalf of Mr. Hines

3    in support of his release on conditions.  In addition to

4    reciting the law, Mr. Cipoletta recites the proposed conditions

5    of release.

6            With that, can I ask you just to hold on for one

7    second while I grab my iPad.  That's where my exhibits are.

8    Excuse me.

9            (Pause.)

10           THE COURT:  Thank you.

11           I find in this electronic age I just can't keep track

12   of everything I need to have in front of me.  All right.

13           Now, Mr. Cipoletta, is that correct, we're going

14   forward on a preliminary hearing and the detention hearing?

15           MR. CIPOLETTA:  Correct, Your Honor.

16           THE COURT:  All right.  Ms. Sullivan Jacobus.

17           MS. JACOBUS:  Your Honor, the Government would call

18   special agent from the FBI, Derek Back.

19           THE WITNESS:  Good morning, sir.

20           THE COURT:  Good morning.  Do you want to swear the

21   witness, please.

22           (Witness sworn.)

23           THE WITNESS:  I do.

24           THE CLERK:  Could you please state and spell your full

25   name for the record.

```
 1              THE WITNESS:  Derek Back, D-e-r-e-k B-a-c-k.

 2              THE CLERK:  Thank you.

 3              MS. JACOBUS:  May I proceed, Your Honor?

 4              THE COURT:  Agent Back, may I just ask you a few

 5    questions.  Where are you located right now?

 6              THE WITNESS:  In Lakeville, Mass.

 7              THE COURT:  Okay.  And are you in a room in the FBI

 8    office at that address?

 9              THE WITNESS:  I am, yeah.

10              THE COURT:  Is there anyone else present with you?

11              THE WITNESS:  There is not.

12              THE COURT:  All right.  And do you have any documents

13    related to this case in front of you?

14              THE WITNESS:  I do.

15              THE COURT:  What documents are they?

16              THE WITNESS:  I have the three exhibits.

17              THE COURT:  Okay.  Do you have any other exhibits

18    relating to this case in front of you?

19              THE WITNESS:  I do not.  I do have the motion that you

20    just spoke of --

21              THE COURT:  Yes.

22              THE WITNESS:  -- in front of me, and just sentencing

23    for the crime.

24              THE COURT:  All right.  That is, the penalties, you

25    mean?
```

1          THE WITNESS:  Correct.

2          THE COURT:  Okay.  All right.  Ms. Sullivan Jacobus,

3     you can proceed.

4          MS. JACOBUS:  Thank you.

5          DEREK BACK, having been duly sworn by the Clerk, was

6     examined and testified as follows:

7                         DIRECT EXAMINATION

8     BY MS. JACOBUS:

9     Q.   Good morning, Special Agent Back.  Could you just tell the

10    Court a little bit about your background.  How long have you

11    been employed by the FBI?

12    A.   I've been employed by the FBI for approximately one year.

13    Q.   Full time?

14    A.   Full time.

15    Q.   Prior to that, were you employed in another law

16    enforcement capacity?

17    A.   I was.

18    Q.   What was that job?

19    A.   I was a police officer for about nine years.

20    Q.   Full time?

21    A.   Yes.

22    Q.   And where were you a police officer for about nine years?

23    A.   Well, in combination I was with the Plymouth Police

24    Department for about seven and a half and then I was on

25    Martha's Vineyard for another two or three.

1   Q.    As an FBI agent, have you been assigned to a particular

2   location?

3   A.    I have.

4   Q.    And where are you assigned to?

5   A.    In Lakeville, Massachusetts.

6   Q.    Okay.  And do you work with other special agents at that

7   Lakeville location?

8   A.    I do.

9   Q.    In general, what are your duties and responsibilities?

10  A.    To investigate federal crimes.

11  Q.    In addition to working with other federal law enforcement

12  agencies, do you also work with state and local law enforcement

13  agencies as a FBI special agent?

14  A.    I do.

15  Q.    All right.  What types of cases are you responsible for

16  investigating?

17  A.    Currently we -- I myself am responsible for health care

18  fraud as well as violent crimes against children.

19  Q.    Okay.  And have you received at least some limited

20  training in the area of child exploitation and child

21  pornography?

22  A.    I have in child exploitation.

23  Q.    Okay.  Let me ask you, Special Agent Back, are you

24  familiar with a criminal complaint that was issued on December

25  1st, 2020, against Domenique Dequon Hines charging him with one

1    count of production or attempted production of child

2    pornography in violation of 18 United States Code Section 2251

3    small a as in apple and small e as in egg?

4    A.    I am.

5    Q.    Have you had an opportunity to review the one-page

6    criminal complaint and the nine-page signed affidavit in

7    support of the criminal complaint that I just referred to?

8    A.    I have.

9    Q.    And was the affiant of that criminal complaint a fellow

10   FBI agent assigned to your Lakeville office?

11   A.    Yes.

12   Q.    And who was the affiant of that complaint and of that

13   affidavit in support of the complaint?

14   A.    Special Agent Lisa Crandall.

15   Q.    All right.  Have you had a chance to speak with Special

16   Agent Crandall about this investigation in this case?

17   A.    I have.

18   Q.    And have you reviewed the affidavit in the complaint that

19   I just referred to and asked you about?

20   A.    I have.

21   Q.    Do you have a copy of that in front of you which has been

22   marked with a yellow sticky as Exhibit number 1?

23   A.    I do.

24          MS. JACOBUS:  Your Honor, the Government would move to

25   introduce Exhibit 1, which is the one-page criminal complaint

1    and the nine-page signed affidavit in support of the complaint

2    in relation to this case.

3                 THE COURT:  All right.

4                 MR. CIPOLETTA:  No objection.

5                 THE COURT:  It's admitted.

6                 MS. JACOBUS:  Okay.

7                 (Government Exhibit 1 received in evidence.)

8    BY MS. JACOBUS:

9    Q.   Special Agent, let me just ask you, in connection with

10   this case, you're familiar with the federal statute that I just

11   referred to, 18 U.S.C. Section 2251 small a and small e?

12   A.   Correct.

13   Q.   And the maximum period of imprisonment for an individual

14   with no prior convictions or no prior sex offense convictions

15   would be 30 years with a 15-year mandatory minimum sentence

16   upon the conviction, correct?

17   A.   Correct.

18   Q.   And if an individual has a prior conviction that relates

19   to a sex offense against a child, does that increase the

20   maximum period of imprisonment?

21   A.   It does.

22   Q.   And does that increase it to 50 years, five-zero, with a

23   25-year mandatory minimum?

24   A.   Yes.

25   Q.   Okay.  Sir, in connection with this investigation, have

1   you had a chance to review Exhibit number 2 and Exhibit number

2   3 for purposes of this preliminary hearing and detention

3   hearing?

4   A.   I have.

5   Q.   And do you have a copy of both Exhibit 2 and Exhibit 3 in

6   front of you, sir?

7   A.   Yes.

8        MS. JACOBUS:   Your Honor, for the record I provided

9   Exhibits 1, 2, and 3 to both Ms. King and also to Mr. Cipoletta

10  prior to today in connection with this case and also to Special

11  Agent Back.

12       THE COURT:   Okay.

13  Q.   Special Agent, Exhibit number 1 I'm asking you to direct

14  your attention to first.   Is it fair to say that that's a

15  seven-page document, and there's a yellow exhibit sticky on the

16  first page of that seven-page document?

17  A.   Yes.

18  Q.   Is it also fair to say that the actual exhibit is redacted

19  on pages 1 and 2, page 1 relating to fax numbers and actual

20  names relating to the FBI and page 2 the full date of birth of

21  Mr. Domenique D. as Dequon Hines?

22  A.   Yes.

23  Q.   And it's also fair to say there's a redaction on page 3 of

24  that same document; again, the redaction would be the full date

25  of birth of Mr. Hines?

1    A.    Yes.

2    Q.    This seven-page document, sir, is this a docket sheet for

3    disposition of a criminal case out of the McHenry,

4    M-c-H-e-n-r-y, County Clerk of the Circuit Court out of

5    Woodstock, Illinois, relating to Domenique Hines?

6    A.    Yes.

7    Q.    And I would like to direct your attention to page 2 of

8    that seven-page document, which is marked as Exhibit number 2.

9    Do you see where I'm referring to, page 2?

10   A.    Yep.

11   Q.    I'd like to direct your attention more specifically to

12   approximately one third to one half of the way down on page 2.

13   Does that talk about a conviction of a particular offense?

14   A.    It does.

15   Q.    And just, if you would, please read to the left side of

16   page 2, what is the phrase relating to that particular

17   conviction?

18   A.    It would be child pornography slash solicitation of a

19   child slash photo.

20   Q.    And is it also fair to say that the word "pornography" is

21   shortened to porn and the word "solicitation" is shortened to

22   s-o-l?

23   A.    Yes.

24   Q.    And there's a conviction for that particular offense.  And

25   I'd like to ask you to direct your attention to just below the

1  judgment of conviction phrase on page 2 of Exhibit 2.  Does it

2  have a date of that conviction?

3  A.   It does.

4  Q.   And what is that date, sir?

5  A.   6/8 -- 6/8/2018.

6  Q.   Okay.  And to the left side of 6/8/2018 -- that actually

7  appears twice, 6/8/2018; is that fair to say?

8  A.   Yes.

9  Q.   To the left side of the second time that 6/8/2018 appears,

10  what's the period of imprisonment that Mr. Hines received in

11  connection with that conviction?

12  A.   Four years.

13  Q.   Okay.  And you've reviewed the seven-page document prior

14  to testifying today in connection with this case, correct?

15  A.   Correct.

16       MS. JACOBUS:  All right.  Your Honor, the Government

17  would move to introduce Exhibit number 2 as the next exhibit

18  for purposes of this hearing today.

19       MR. CIPOLETTA:  No objection.

20       THE COURT:  It's admitted.

21       (Government Exhibit 2 received in evidence.)

22  BY MS. JACOBUS:

23  Q.   Special Agent Back, directing your attention to Exhibit

24  number 3, how many pages is that exhibit which you now have in

25  front of you?

1    A.    That would be four pages total.

2    Q.    Have you had a chance to review this four-page document

3    prior to your testimony today?

4    A.    I did.

5    Q.    And is this Exhibit number 3 a copy of the indictment out

6    of Illinois that relates to the docket sheet that I just

7    entered as Exhibit number 2 and that I asked you some questions

8    about?

9    A.    It does.

10   Q.    I would like to direct your attention to page 1 of this

11   four-page document, more specifically to Count 2.  Do you see

12   where I'm referring to?

13   A.    I do.

14   Q.    All right.  Is Count 2 the count that resulted in the

15   conviction that you just talked about that was outlined on page

16   2 of the docket sheet which has been entered as Exhibit number

17   2?

18   A.    Yes.

19   Q.    Okay.  And that talks about -- that's the statutory

20   language, and it also includes the statutes under Illinois

21   state law, correct?

22   A.    Correct.

23   Q.    And does it relate to -- does it talk about this offense

24   being a particular type of class 1 felony?

25   A.    Yes.

1   Q.   Okay.  I'm sorry.  Not a particular type.  That it is in

2   fact a class 1 felony; is that correct?

3   A.   Correct.

4   Q.   All right.

5          MS. JACOBUS:  Your Honor, the Government would move to

6   introduce Exhibit number 3 as the next exhibit for purposes of

7   today's hearing.

8          MR. CIPOLETTA:  No objection.

9          THE COURT:  It's admitted.

10          (Government Exhibit 3 received in evidence.)

11  BY MS. JACOBUS:

12  Q.   Special Agent Back, prior to your testimony in connection

13  with this case, did you have an opportunity to review the

14  criminal record for Mr. Domenique Dequon Hines?

15  A.   I did.

16  Q.   And did you learn that he got off his parole on September

17  20th, 2020?

18  A.   Yes.

19  Q.   And, sir, in connection with this case and your review of

20  the affidavit, did you learn -- and also your review of

21  Mr. Hines' record, did you determine -- how old is Mr. Hines?

22  A.   23.

23  Q.   All right.  And in review of the affidavit in support of

24  the criminal complaint, how old was the minor victim who was

25  identified as minor A throughout the affidavit in support of

1  that complaint?

2  A.   14.

3  Q.   Did your review of the documents in connection with this

4  case determine that there was a time frame that Mr. Hines and

5  minor A communicated using iMessages online?

6  A.   Yes.

7  Q.   And was that time frame from on or about October 28, 2020,

8  through on or about November 6th, 2020, at least as it relates

9  to the iMessage communications?

10  A.   Yes.

11  Q.   So is it fair to say that would be only weeks after

12  Mr. Hines got off of parole that he began communicating with

13  minor A using iMessages?

14  A.   Yes.

15  Q.   In reviewing Mr. Hines' record, have you also been able to

16  determine that there were warrants issued in other criminal

17  cases relating to Mr. Hines that were not sex-offense-related

18  cases?

19  A.   Yes.

20  Q.   And during the course of the communications online, is it

21  fair to say that minor A resided in the Commonwealth of

22  Massachusetts during that time period?

23  A.   Yes.

24  Q.   And I direct your attention to on or about December --

25  no -- on December 3rd of 2020, on that particular date was

1  Mr. Hines arrested in connection with the criminal complaint

2  and the affidavit in support of the complaint that I've been

3  asking you about during the course of today's hearing?

4  A.    Yes.

5  Q.    And do you know what state was Mr. Hines arrested in?

6  A.    Illinois.

7  Q.    Okay.  During the time period that minor A and the

8  defendant communicated, is it fair to say that the defendant

9  informed minor A that he was 23?

10  A.    Yes.

11  Q.    That minor A informed the defendant that she was 14?

12  A.    Yes.

13  Q.    And that minor A is a female, correct?

14  A.    Correct.

15  Q.    And is it also fair to say that the affidavit in support

16  of the complaint outlined that after meeting online and

17  exchanging phone numbers and profile pictures, Mr. Hines asked

18  minor A to take and send him sexually explicit photos of

19  herself; is that correct?

20  A.    Yes.

21  Q.    And at his request did she do so?

22  A.    She did.

23  Q.    In addition did Mr. Hines ask minor A to take and send

24  videos of herself, including videos of her naked, at least one

25  in the shower and one of her undressing?

1   A.   Yes.

2   Q.   And at his request, did minor A comply and do so?

3   A.   Yes.

4   Q.   Was there also communications between the two where there

5   was sexually explicit language discussed?

6   A.   Yes.

7   Q.   And did Mr. Hines ask minor A during the course of their

8   iMessages exchange to refer to him by a particular name?

9   A.   Yes.

10  Q.   And what was the name that Mr. Hines asked minor A to

11  refer to him as?

12  A.   Daddy.

13  Q.   Okay.  And I would like to direct your attention to

14  Exhibit number 1, which is the affidavit in support of the

15  criminal complaint and the complaint, is it fair to say if I

16  direct your attention to paragraph 10 of that indictment

17  which begins on page 4, Special Agent Back, and continues on to

18  page 5.

19  A.   Okay.

20  Q.   Do you see where I'm referring to, sir?

21  A.   Yes, I do.

22  Q.   I would like to ask you specifically, did Mr. Hines ask

23  minor A to send him -- that he wanted to look at a picture of

24  minor A while he masturbated?

25  A.   Yes.

1    Q.   And did minor A comply and send him a particular

2    photograph?

3    A.   Yes.

4    Q.   And is that photograph outlined on pages 4 and 5 of the

5    affidavit in support of the complaint?

6    A.   Yes.

7    Q.   Is it also fair that there was a forensic interview

8    conducted of minor A?

9    A.   Yes.

10   Q.   In connection with this case on or about November 23rd of

11   2020?

12   A.   Yes.

13   Q.   As outlined in the affidavit, was minor A shown certain

14   photographs and images that she was able to identify to

15   authorities as images and photos of herself that she took and

16   sent to Mr. Hines at his request?

17   A.   Yes.

18   Q.   And is one of those images the image that is outlined in

19   paragraph 10 of the affidavit in support of the complaint?

20   A.   It is.

21   Q.   Okay.

22        MS. JACOBUS:  Your Honor, if I might have a moment?

23        THE COURT:  Uh-huh.

24        (Pause.)

25        MS. JACOBUS:  No further questions for Special Agent

1    Back at this time.  Thank you, sir, for your time.

2              THE WITNESS:  Thank you.

3              THE COURT:  Mr. Cipoletta?

4              MR. CIPOLETTA:  Thank you, Your Honor.

5                        CROSS-EXAMINATION

6    BY MR. CIPOLETTA:

7    Q.   Good morning, Special Agent.

8    A.   Good morning, sir.

9    Q.   I just have a couple of questions.  And I want to talk to

10   you about the age of the person who was referred to as minor A

11   in the affidavit, okay?

12             So you testified that she had indicated that she was

13   14 years old and Mr. Hines indicated he was 23 years old; is

14   that right?

15   A.   Yes.

16   Q.   But, as a matter of fact, in the affidavit there's also an

17   indication that the individual referred to as minor A had

18   previously told him that she was 15 years old; is that right?

19   A.   It is.

20   Q.   So how was it -- how old is minor A, by the way?

21   A.   14.

22   Q.   And how was that determined?

23   A.   Her date of birth.

24   Q.   And how did you -- by what means, a birth certificate or

25   some other document?

1   A.   I have not done that.

2   Q.   Okay.  So there was -- there was some photographs that

3   were shown to minor A as a result of a forensic analysis of her

4   phone?

5   A.   Yes.

6   Q.   And the photographs that she identified were photographs

7   of herself; is that right?

8   A.   Right.

9   Q.   Were there any photographs of Mr. Hines shown to minor A?

10  A.   I believe so.

11  Q.   And do you know whether or not those are kind of sworn to

12  in the affidavit that's marked as an exhibit?

13  A.   I don't.  If I could refer to them?

14  Q.   Sure.  In fact, I'm having trouble finding where there's

15  an indication that she identified Mr. Hines from any

16  photographs, but if you can find that in the affidavit?

17  A.   Oh, all right.  Yeah, I just need a minute.

18  Q.   Sure.

19       (Pause.)

20  A.   It would be 14.

21  Q.   And this was a FaceTime photograph -- or screenshot from a

22  FaceTime chat?

23  A.   I don't know the answer to that, what they used for the

24  photograph.

25  Q.   Sure, that's fair.

1              In any event, just to establish a time line here, in

2    paragraph 19 -- it seems to be the earliest date -- minor A's

3    iPhone was reviewed, and that was on October 28th, is that

4    right, in paragraph 19?

5    A.   Yes.

6    Q.   So someone took a look at -- I'm sorry.

7              There was activity between 28 October and November

8    6th.  And that's in paragraph 19, right?

9    A.   Uh-huh.

10   Q.   And then there was a forensic review of minor A's iPhone

11   on November 17th, 2020.  That's paragraph 18?

12   A.   Yep.

13   Q.   And that's when the data and photographs and other files

14   were extracted from her iPhone?

15   A.   I believe that would be from her phone.

16   Q.   Okay.  And then she was interviewed, however, about six

17   days later on November 23rd.  And that would be paragraph 14?

18   A.   Yep.

19   Q.   Just so I have the timeline correct, the phone was

20   forensically reviewed before the interview with minor A by

21   about a week or thereabouts, right?

22   A.   Correct.

23   Q.   And that phone came into possession of law enforcement by

24   what means?

25              MS. JACOBUS:  Your Honor, objection.  Relevance for

 1   purposes of probable cause and detention.  This is not a

 2   discovery tool.

 3          THE COURT:  I'll allow it.  I'm not sure where you are

 4   going with it, Mr. Cipoletta, but if you can make your point.

 5          MR. CIPOLETTA:  Sure.

 6   BY MR. CIPOLETTA:

 7   Q.   So fair to say that the -- somehow the telephone got into

 8   the possession of law enforcement ahead of the time that minor

 9   A was actually interviewed, right?

10   A.   Yes.

11   Q.   How did law enforcement know what to look for?

12   A.   What to look for in the phone?

13   Q.   Yes.

14   A.   With regards to their training, things like that?

15   Q.   Well, if any -- and here's where I'm going with this:  Is

16   that they looked at the phone before they spoke with her,

17   right?

18   A.   Correct.

19   Q.   So how did -- what caused law enforcement to take

20   possession of minor A's phone if they hadn't interviewed her

21   yet?

22   A.   I believe --

23          MS. JACOBUS:  Objection, Your Honor.

24          THE COURT:  Grounds?

25          MS. JACOBUS:  Relevancy.

```
 1              THE COURT:  No, I'll allow it.
 2   A.   I believe it was -- they had gotten the information from
 3   the parents, her parents.
 4   Q.   And the parents at some point, as is set out in the
 5   affidavit, turned over a USB thumb drive to law enforcement?
 6   A.   Correct.
 7   Q.   And the information on the USB that was turned over by the
 8   parents contained what?
 9   A.   I believe it was messages through the iCloud, saved on the
10   iCloud.
11   Q.   And iCloud is something that's a data storage component of
12   having an iPhone, and it's kept somewhere off the device, is
13   that right?  In the cloud, as they say?
14   A.   Yes --
15   Q.   Okay.
16   A.   -- to be accurate.
17   Q.   So who downloaded the information from the iCloud?
18              MS. JACOBUS:  Objection.  Again, Your Honor, it's
19   relevancy.  This is a probable cause and detention hearing.
20              THE COURT:  I'll sustain it.
21   BY MR. CIPOLETTA:
22   Q.   Was the USB thumb drive analyzed by law enforcement?
23   A.   I believe so.  I don't have the answer to that.
24   Q.   Okay.  And if it were, there would be some record of it
25   somewhere, right?
```

1    A.    Yes.

2    Q.    Okay.  Who arrested Mr. Hines?

3    A.    As far as?

4    Q.    Was it federal authorities or state?

5    A.    I don't have the answer to that.

6    Q.    Okay.  Do you know when and where he was arrested?

7    A.    I don't.

8    Q.    Do you know whether or not he was interrogated?

9    A.    I don't.

10   Q.    And whether or not he gave any statements?

11   A.    I don't have that.

12   Q.    When Mr. Hines was arrested, do you know whether or not

13   that was pursuant to an arrest warrant?

14   A.    I don't.

15   Q.    How about a search warrant; was there a search warrant

16   issued?

17   A.    I don't know.

18          MS. JACOBUS:  Objection, Your Honor.

19          THE COURT:  Sustained.

20          MS. JACOBUS:  Move to strike.

21   Q.    When Mr. Hines --

22          THE COURT:  The last question and answer are stricken.

23   Mr. Cipoletta, I don't want to sit through a discovery session

24   that you may want to have.  So ask questions that are relevant

25   to probable cause or detention or stop asking questions.

1   BY MR. CIPOLETTA:

2   Q.   When Mr. Hines was arrested, where physically was he?

3   A.   I don't know where he physically was.

4   Q.   Is there any evidence or any reports that indicate that he

5   tried to elude law enforcement?

6   A.   I don't have that information.

7          MR. CIPOLETTA:  I have no further questions, Your

8   Honor.

9          THE COURT:  Okay.

10          MS. JACOBUS:  Your Honor, just briefly.  I just want

11   to clarify a couple of things.

12                    REDIRECT EXAMINATION

13   BY MS. JACOBUS:

14   Q.   Special Agent Back, turn your attention to page 3,

15   paragraph 6 of the affidavit in support of the criminal

16   complaint, if you will.

17   A.   Okay.

18   Q.   Is it fair to say that the defendant sent a picture of an

19   adult male's face to minor A, a picture of himself to minor A?

20   A.   Yes.

21   Q.   Is it also fair to say that minor A informed Mr. Hines

22   that she had previously lied about being age 15 and stated that

23   she was only 14?

24   A.   Yes.

25   Q.   Is it also fair to say that she confirmed her age to

1    Mr. Hines as 14 before Mr. Hines asked her to send him -- to

2    take and send any sexually explicit photographs of herself?

3    A.   Yes.

4    Q.   Or videos of herself; is that fair to say?

5    A.   Yes.

6    Q.   Okay.  And is it also fair to say that you were not the

7    affiant of the affidavit, the complaint, or the arrest warrant

8    in support of the complaint in connection with this case?

9    A.   Correct.

10   Q.   But you understand that Mr. Hines was arrested in the

11   state of Illinois on December 3rd, 2020, in connection with

12   this case; is that fair to say?

13   A.   Yes.

14        MS. JACOBUS:  Thank you.  I have nothing further.

15        THE COURT:  All right.  Thank you, Agent.

16        THE WITNESS:  Thank you, sir.

17        THE COURT:  Ms. Jacobus, any other witnesses?

18        MS. JACOBUS:  No further witnesses and no further

19   exhibits for purposes of today's hearing.  Thank you.

20        THE COURT:  All right.  Mr. Cipoletta, do you want to

21   call any witnesses?

22        MR. CIPOLETTA:  No, no, Your Honor, no witnesses, but

23   I would like to be heard on detention.

24        THE COURT:  Okay.  Well, before we get there, I'd like

25   to hear you on probable cause.

1          MR. CIPOLETTA:  If it please the Court, Your Honor,

2    based on what we have from the affidavit and the agent's

3    testimony, it would appear to me that the Government has

4    sustained its burden on probable cause.

5          THE COURT:  Okay.  I turn then to detention.

6          Ms. Sullivan Jacobus, it's the Government's motion.

7    I'll hear you first.

8          MS. JACOBUS:  Thank you, Your Honor.

9          Your Honor, I should have just clarified with the

10   Court, it's my understanding that the Court would take judicial

11   notice of the defendant's criminal record and the information

12   relative to his record contained in pretrial services; that's

13   why I did not enter that as an exhibit.

14         THE COURT:  Yeah, I have the Pretrial Services report.

15         MS. JACOBUS:  Thank you, Your Honor.

16         Your Honor, as the Court is well aware, turning to

17   detention, there is a rebuttable presumption that exists in

18   this case.

19         This is an individual who is a repeat sex offender,

20   who is a registered sex offender, who is facing a 25-year

21   mandatory minimum sentence if he is convicted of this charge of

22   18 U.S.C. Section 2251 small a and small e, sexual exploitation

23   of children.  In the event if the defendant had not had a prior

24   sex offense against a child conviction, he'd still be looking

25   at a significant period of incarceration upon a conviction.  By

1   that I mean he would be facing a 30-year maximum with a 15

2   mandatory minimum rather than a 50-year maximum with a 25-year

3   mandatory minimum.

4         I've submitted to the Court Exhibits 2 and 3, which

5   outline the docket sheet and the indictment that led to the

6   conviction of one count of that indictment charging the

7   defendant with solicitation of a child, child pornography,

8   where he received a four-year committed term in June,

9   specifically on June 8th, 2018.

10        Your Honor, this defendant, if you look at the

11   Pretrial Services report, was released from the incarcerative

12   portion of his sentence in September of 2019.  He was released

13   on parole.  His parole period ended on September 21st of 2020.

14   By my count, Your Honor, that was only 30 -- approximately 37

15   days before this defendant began communicating on line via

16   iMessages with a 14-year-old minor female, a ninth grade

17   student here in the Commonwealth of Massachusetts.

18        This defendant in his interview with Pretrial Services

19   says that he has been living at a particular residence in

20   Illinois with his mother since he was released from parole.  So

21   this defendant was in Illinois the entire time he was

22   committing this offense against this 14-year-old girl here in

23   the Commonwealth of Massachusetts.

24        This is a very serious offense, an offense committed

25   against, which I would argue, against the most vulnerable

1    members of our population, namely children.  This defendant

2    committed this offense while hiding behind the screen of his

3    cell phone.  This defendant seeks to be released to the same

4    home to live with his mother that he lived at while he was

5    committing this offense.

6            And whether this Court would say he can't have a

7    phone, I would suggest to the Court there are some limitations

8    of what could be done in the event that he was released on

9    electronic monitoring.  One of those limitations, which I would

10   suggest to the Court would be impossible for Probation to be

11   able to control, would be if anybody comes to that house to

12   visit his mother or anybody comes to that house to deliver

13   packages or anybody comes to that house, they may very easily

14   have a cell phone.  And it is clear that this defendant can

15   easily access phones because he was the one that was

16   communicating with this 14-year-old girl during the period of

17   time from on or about October 28th through November 6th.

18           I would suggest to the Court that the defense in the

19   four-page document that he has outlined, he outlines and lists

20   where he would suggest and propose that the defendant be

21   released to and what he would have for limitations, I would

22   respectfully suggest to the Court that that's not sufficient,

23   and that the defendant's proposal does not combat the

24   rebuttable presumption, that there is no condition or

25   combination of conditions that would warrant -- provide for the

1    safety of this minor victim or any children under the age of 18

2    based on this repeat offender's serious offense that he has

3    committed.

4         And for those reasons, I would respectfully suggest to

5    the Court that the defendant should be detained in this case.

6    And I thank you for your time and your consideration.

7         THE COURT:  Mr. Cipoletta?

8         MR. CIPOLETTA:  Your Honor, yes.  Thank you.

9         I would like to address the two motions separately.

10   First, with respect to Mr. Hines being a risk of flight, his

11   mother has indicated that she would be willing to be a

12   custodial person responsible for him.  She's been interviewed

13   by Pretrial Services but probably not to the extent or in the

14   fashion that the Court may want in order to determine whether

15   or not his mother is a fit person, although that's an

16   assumption on my part.  It may be wrong.  Pretrial Services may

17   have done that.

18        Electronic monitoring is a very -- is a very

19   restrictive condition where he would be not allowed to go

20   anywhere outside the geographic area and certainly not anywhere

21   where children would be or where he would be able to visit

22   unaccompanied with any minors.

23        It seems that a risk of flight, he has -- he's lived

24   there in Illinois, in Crystal Lakes, he lived with his mother.

25   That's where his family is.  That's where his ties are to the

1    community.  He has -- the Court has seen the Pretrial Services

2    report.  He has no money.  He has nowhere to go.  He doesn't

3    have a passport, or if he does, he's ordered to give it up.

4         He has a job at his previous employer.  He's on leave

5    there, but I've been told by both he and his mother that they

6    are waiting to see whether or not he would be returning to

7    Illinois.  And if he were to return there, he would be

8    gainfully employed unless the Court saw fit to confine him

9    completely to home detention, whereas he would only be able to

10   leave home for medical appointments, legal appointments, or

11   essentially emergency reasons.  That could be a condition that

12   would be imposed as well.

13        As to whether or not he's dangerous, it seems to me

14   that the Government has pointed to, and rightfully so because

15   Mr. Hines' record speaks for itself, but there are conditions

16   that can be imposed.  It seems that, as the Government says,

17   Mr. Hines' previous conviction committed these acts from behind

18   the safety or the disguise of a cell phone, but if he's not

19   allowed to have access to any digital phone, to the Internet,

20   iPad, or any computer or other equipment capable of accessing

21   the Internet, he would not be able to engage in the activities

22   that the Government seems to rightfully be concerned.

23        Not only would he not be able to have possession or

24   access to these, he would be prohibited from accessing the

25   Internet.  Even if he were at work or somebody showed up at the

1    door or if his mother had a computer, there is a condition that

2    I have proposed corollary to that, and that is that Pretrial

3    Services would be able to go in and take a look at the home and

4    so forth and whether or not Mr. Hines had -- that he was locked

5    out of the computer.  Let's say if his mother has an iPad or a

6    laptop, she would have to lock him out of it and lock it up

7    when she's not using it.

8          There are conditions that can in fact be imposed to

9    head off any concerns that Mr. Hines would be engaging in the

10    type of activity that he is accused of in this case and in fact

11    convicted of in the case brought by the State of Illinois.

12          I don't know whether or not, because I haven't seen

13    any documents, whether or not there are any conditions such as

14    that with respect to his parole.  He's off parole.  I think

15    he's been off since September.  If there were such conditions

16    that were imposed as a -- attached to his parole release, it

17    doesn't appear that he violated any of those, so there wouldn't

18    be any indication that if ordered by the Court as a condition

19    of release, he would be -- he would violate them given the

20    suggested restrictive conditions that we have proposed.

21          And in closing, Your Honor, I would suggest that if

22    there are conditions or a combination of conditions that would

23    protect the community from activities that the Government is

24    concerned about and also to minimize or eliminate any risk of

25    flight during the pendency of the court proceedings.

1            Thank you, Your Honor.

2            THE COURT:  Thank you, Mr. Cipoletta.

3            Ms. Dailey, can I hear from Probation.

4            U.S. PROBATION:  Excuse me, Your Honor?  I could not

5    hear you.

6            THE COURT:  I just want to hear from Probation, and

7    that is, Mr. Cipoletta's proposing that the defendant be

8    released to his residence.  How able is the Probation

9    Department to monitor whether an individual can get access to

10   the Internet or Internet-capable devices and the like?  In your

11   experience, how successful are they?

12           U.S. PROBATION:  Your Honor, considering that he is

13   going to be living at home with his mother and his three

14   youngest brothers, his mother informed me that the three

15   youngest brothers are 12, 11 and 9, they are currently being

16   home schooled due to COVID-19.  So they do have their own, I

17   guess, computers there so that they are able to be home

18   schooled there.  And I am not aware of any other computer

19   devices that are in the home.

20           THE COURT:  And is Probation able to monitor a

21   defendant's access to the Internet through whatever means are

22   available?  I'm not sure I know.

23           U.S. PROBATION:  We have something called remote.com.

24   And typically we put that -- if Mr. Hines had a computer of his

25   own, we would put that on his computer device or his cell

1   phone, and we would be able to monitor his activity through

2   that.

3          I'm not sure about putting that remote.com on his like

4   younger siblings' computers for school or his mother's computer

5   as well.  That may be something his mother may have to agree

6   to.

7          THE COURT:  Okay.  Thank you.

8          THE DEFENDANT:  May I speak to my attorney, please?

9          THE COURT:  Yes, sure.

10         Ms. King, can you put Mr. Cipoletta and Mr. Hines in a

11  breakout room?

12         THE CLERK:  Yes.

13         (Discussion off the record.)

14         THE COURT:  All right.  We have Mr. Hines and

15  Mr. Cipoletta back.

16         Ms. Sullivan Jacobus, anything else from the

17  Government on detention?  You are muted.

18         MS. JACOBUS:  I apologize, Your Honor.  Just very

19  briefly.  I know the Court does have the Pretrial Services

20  report, but I just want to make sure that the record is clear.

21  Ultimately, on the last pages of the Pretrial Services report,

22  Pretrial Services has determined this defendant poses both a

23  risk of noncompliance and a danger.  And I know you do have a

24  copy of that report, as well as the defendant's record.

25         I also -- relative to risk of flight, I just also

1    wanted to argue to the Court that I do believe that we have

2    satisfied the standard for risk of flight.  And the defendant's

3    record does also list that he has had warrants issued on more

4    than one occasion, so I would suggest to the Court that he does

5    not comply with court orders and I think that is another

6    argument we could make in support of our basis for detention in

7    this case.  And I thank you again.

8            THE COURT:  All right.  Now, Mr. Cipoletta, anything

9    else?

10           MR. CIPOLETTA:  Yes, Your Honor.

11           While the Court was good enough to give us the

12   breakout room, Mr. Hines supplied me with two pieces of

13   information that I think is important to relay to the Court.

14           The first is with respect to the computers that his

15   siblings use in the home for home schooling, those are -- those

16   are restricted, and they can access the school -- the school

17   site where they're being taught.  They cannot access any

18   Internet sites that are not school-related.  Apparently these

19   computers are basically locked down and restricted, and that

20   could probably be checked out on the Illinois side to make sure

21   that that information is correct.

22           There's one thing that I meant to bring up, and

23   Mr. Hines reminded me, and that's why I was asking the agent

24   how Mr. Hines was arrested because Mr. Hines indicated that he

25   self-surrendered.  I thought it might have been on this

1   case -- on the 2018 conviction.  He self-surrendered when he

2   found out there was a warrant on the state case.  In 2017, he

3   voluntarily went to authorities and turned himself in when he

4   found out there was an arrest warrant.  That was my confusion.

5   I thought he was referring to this case.  So those were the two

6   things I thought might be important, Your Honor.

7          THE COURT:  Okay.  Thank you.  All right.  I think I

8   am prepared to rule, and I want to put on the record my ruling

9   and the reasons for it so that review or appeal of it can be

10  taken.

11         The Government moves to detain Mr. Hines on both

12  grounds of risk of flight and danger.  The law is as follows:

13  In order to detain a person under the Bail Reform Act, the

14  court must find by clear and convincing evidence that the

15  defendant is a danger to the community or by a preponderance of

16  the evidence, a lower standard, that the defendant poses a risk

17  of flight.  The court may detain a person pending trial only if

18  the court determines that no condition or combination of

19  conditions will reasonably assure the person's appearance as

20  required and the safety of any other person in the community.

21         In making that determination, I'm required to consider

22  the four factors that are set forth in 3142(g).  They are the

23  nature and circumstances of the offense charged, including

24  whether the offense involved a crime against a child; the

25  weight of the evidence; the history and characteristics of the

1    person, their physical and mental condition, family ties,

2    employment, and the like; whether at the time of the current

3    offense or arrest the person is on probation, parole, or other

4    release; and, finally, the nature and seriousness of the danger

5    to any person or the community.

6         This case, because of the nature of the crime, also

7    triggers a presumption that there is no condition or

8    combination of conditions that will reasonably assure

9    Mr. Hines' appearance as required for the safety of any other

10   person and the community.  That's a rebuttable presumption.  To

11   meet that presumption, the defendant must produce only some

12   relevant evidence.  The introduction of such evidence does not

13   eliminate the presumption entirely.  The presumption remains in

14   the case as one of the elements to be considered.

15        Weighing those factors, I find that the Government has

16   met its burden both on a danger and risk of flight.

17        I'm going to address danger because I actually find

18   that to be the more compelling case, and even though it

19   requires a higher showing, that is, clear and convincing

20   evidence, in terms of the nature and circumstances of the

21   offense charged, including whether it involved a minor victim,

22   this case involved precisely that, and Congress had expressly

23   made a determination that a crime of this kind involving a

24   minor victim is a factor that weighs in favor of detention.

25        As pointed out by the Government, and something I find

1   very persuasive, the defendant thought to exploit the

2   vulnerability of the child.  The young lady in this case, 14

3   years old, look, even if she's 15, is immature and easily

4   misled, and the evidence presented showed that Mr. Hines sought

5   to exploit this vulnerability and to do so for his own sexual

6   gratification.

7         And as noted, this is not the first time that

8   Mr. Hines has done this.  He's been previously convicted of

9   soliciting a minor of child pornography in a case involving a

10   13-year-old victim, and despite a period of incarceration at

11   least, if I calculate it up, at least two years, none of that

12   had the desired effect of rehabilitating this defendant or

13   deterring him from engaging in the same conduct.  Rather, to

14   the complete contrary, again as argued by the Government,

15   within a matter of weeks of his release from the Illinois

16   Department of Corrections, the defendant was at it again, and

17   that is the situation that supports the current charge; that

18   is, he was seeking to communicate with a minor for purposes of

19   obtaining images of child pornography and in fact succeeded in

20   doing so.  So the nature and circumstances of the offense

21   support the defendant's detention and so does the weight of the

22   evidence.

23         Obviously the defendant is presumed innocent, and he's

24   not guilty until the Government proves the charge beyond a

25   reasonable doubt.  But the evidence in this case is very

1    strong.  The defendant's image, his communications with the

2    minor victim are memorialized in a communication to her phone

3    and in a USB drive of some kind that her parents provided to

4    law enforcement when they initially reached out to law

5    enforcement to advise them of what they understood to be going

6    on.  So the evidence is -- it's fairly compelling.

7         In terms of history and characteristics of the person,

8    I agree with Mr. Cipoletta.  The defendant actually has many of

9    the things that many defendants who appear before this Court

10   don't have.  He has a supportive family.  He has family ties.

11   He has a job and some -- at least some job history and ties to

12   the greater Chicago area in Crystal Lake, Illinois.  On the

13   other hand, the defendant does have a criminal history, and

14   significantly it's the prior conviction for crimes involving

15   almost the identical conduct with almost an identical profile

16   of the victim, someone the defendant sought to exploit.

17         At the time of the offense the defendant, at least as

18   I understand it, was not on parole or probation.  In other

19   words, he had been released and discharged by the Illinois

20   Department of Corrections in late September of 2020.

21         In terms of the nature and seriousness of the danger

22   that would be posed, the defendant was on release for maybe

23   five weeks before he reached out to this minor victim.  It may

24   be that's the very first victim he reached out to and he

25   hits -- he finds a vulnerable victim who's willing to go along

1    with things.  I find that to be very telling.  It raises

2    enormous concerns about the defendant, his willingness to

3    comply with the law.  He's not on probation.  He's not on

4    parole.  He's still required to comply with the law.

5            And as I indicated previously, the fact that a

6    two-year jail term out of the four years that were imposed, at

7    least that's how I understand it, for engaging in the same

8    conduct did not have the desired effect of deterring the

9    defendant from engaging in the same conduct.

10           I have a serious concern that there are conditions

11   that will protect the community.  Mr. Cipoletta has

12   thoughtfully itemized a number of them.  They go a long way,

13   but they don't go far enough and they certainly don't go far

14   enough in this case.  That's not because of the conditions

15   themselves.  That's because of this defendant.  I don't have

16   any confidence that he would not exploit an opportunity to use

17   a phone, a computer, whether it's at home, whether it's at

18   work, whether it's somewhere in between, in a coffee shop where

19   there's Internet access.  I mean, look, the Internet is

20   everywhere, and policing someone's access to it is, despite

21   Probation's commendable efforts, it's just impossible to do.

22   And when we have a defendant who demonstrates by his conduct

23   that jail sentences are not going to deter him, I have little

24   confidence to believe that my setting a condition -- You're not

25   to use a phone.  You're not to use something that accesses the

1    Internet -- is not going to have an effect either.

2         And so I absolutely find this to be a very strong case

3    for detention on grounds of dangerousness.  Again, I recognize

4    it's a higher standard, but given these conditions, I find the

5    Government has easily met that standard.

6         I find also that the defendant is by a preponderance

7    of the evidence a risk of flight.  This is clearly a closer

8    question because the defendant does have the community ties

9    that I have referred to, job, support of his mother and family.

10   However, the defendant does have a predicate conviction.  If

11   the Government files an 851 allegation that the defendant has

12   been so previously convicted, this defendant faces up to 50

13   years in jail and a mandatory minimum of 25 years.  That

14   dovetails with the presumption in this case, that no condition

15   or combination of conditions will reasonably assure the

16   defendant's appearance.

17        I also considered, as pointed out by the Government,

18   that the defendant's compliance with conditions while on

19   supervision is far from perfect.  In particular, when the

20   defendant was 19 years old, and this is four years ago, the

21   defendant was released in connection with driving with a

22   suspended license on a bond and invoked 2016 and 2017, close to

23   seven or eight warrants that were issued.  And I refer to that

24   because the defendant failed to comply with conditions of his

25   pretrial release.  That's four years ago.  It's not so long ago

1    when one considers the fact that the defendant spent a

2    substantial amount of time between then and today in jail where

3    complying with conditions of his lifestyle is not just an issue

4    even when he had to.

5         So for those reasons, I have also serious concerns

6    about whether any condition or combination of conditions will

7    assure the defendant's appearance as required.  Again, I

8    recognize it's a closer call, but I believe the Government

9    carried its burden and I so find.

10        I will return to one other thing regarding danger, and

11   that is the defendant's mother reports that she lives with the

12   defendant and his three younger siblings in a large apartment

13   complex and children are not in the vicinity of the apartment.

14   You know, that may be true.  I find it a little bit difficult

15   to believe that in a large apartment complex there are not

16   children around; and ironically in the defendant's very

17   apartment there are three children.  I suspect things are

18   perhaps a little bit different than the defendant's mother

19   recalls, and I see that as posing a danger as well for someone

20   who has demonstrated proclivities of sexual attraction to

21   children that this defendant has.  So I add that as an

22   afterthought because I raise it in terms of questioning whether

23   the defendant's mother is accurately reporting the situation.

24        So for all those reasons, I'm granting the

25   Government's motion to detain the defendant.

1          Mr. Hines, another judge looking at this record might

2     come to a different conclusion, and you have a right to seek an

3     appeal of my decision and have a different judge look at it and

4     determine whether in fact you can be released on conditions of

5     bail, and you are hereby notified of that right to appeal.

6          Ms. Sullivan Jacobus, anything else from the

7     Government?

8               MS. JACOBUS:  No.  Thank you.

9               THE COURT:  And Mr. Cipoletta?

10              MR. CIPOLETTA:  Your Honor, no.  Thank you.

11              THE COURT:  Okay.  We're in recess.  Thank you.

12              THE CLERK:  Court stands in recess.

13              (Adjourned at 12:11 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3              I, Linda Walsh, Registered Professional Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the stenographically reported proceedings held in

8    the above-entitled matter, to the best of my skill and ability.

9              Dated this 24th day of January, 2021.

10

11

12              /s/ Linda Walsh

13              Linda Walsh, RPR, CRR

14              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25